FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT ALABAMA
NORTHEASTERN DIVISION

04 MAY 21 AM 10: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

LAURA ACKLIN, LULA BECKWITH, )
SANDRA COLEMAN, WANDA FOSTER, )
DONNA HOLLIMON, BRENDA )
JEFFREYS, JUDY SWINDELL, THELMA )
WELLS, and LINDA WIGGINS, )
                                  )
          Plaintiffs,             )
                                  )
v.                                )          CV-02-JEO-0793-NE
                                  )
                                  )
BELLSOUTH TELECOMMUNICATIONS,     )
INC.,                             )
                                  )
          Defendant.              )

**ENTERED**

**MAY 21 2004**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiffs Sandra Coleman, Wanda Foster, Donna Hollimon, Brenda Jeffreys, Judy

Swindell, and Linda Wiggins filed a complaint against BellSouth Telecommunications, Inc.

("BellSouth," "BST," or "the defendant"), on March 28, 2002, under the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"). (Doc. 1). Laura Acklin, Lula Beckwith,

and Thelma Wells were added as plaintiffs thereafter. (Doc. 13). The matter is presently before

the court on the motion for summary judgment filed by BellSouth. (Doc. 27).

### FACTS[1]

The defendant's telephone service network is divided into geographic areas called

"complexes." (Defendant's Statement of Undisputed Facts ("Def. Statement") at p. 3).[2] The

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] The statement is found at document number 29 in the record.

53

"network routes all calls within a complex through a single host switch, located in that same complex, that bridges an operator into the call for handling." (*Id.*). "As a part of its local exchange telephone service, BST historically has provided 'traditional' IntraLATA toll service (i.e., toll service <u>within</u> a single Local Access Transport Area) to its retail telephone customers. Traditional retail IntraLATA toll service includes collect calls, credit calls, person-to-person [calls], and calls billed to third parties, i.e., 'O' or 'O+' dialing." (*Id.* at p. 3 citing Ray Whitman Declaration ("Whitman Dec.") at ¶ 4).[3]

"Earning a satisfactory score on the General Qualifications Test ("GQT") is a prerequisite for most jobs at BST." (Def. Statement at p. 2). "The GQT is a paper-and-pencil, standardized test" to measure employees. (*Id*) There are three ratings that result from the testing: "Not Qualified, Level 1, or Level 2." (*Id.*). "To be eligible for a Level 2 position, a candidate either must already hold a Level 2 position or must earn a Level 2 rating on the GQT." (*Id.*).[4]

On September 9, 2000, Plaintiffs Acklin, Coleman, Foster, Holliman, Swindell, Wells, and Wiggins and other BellSouth employees took the GQT. (Def. Statement at p. 2). The tests were scored on September 9, 2000, and the "test-takers" were immediately notified of the results. (*Id.*). None of the plaintiffs scored well enough to qualify for a Level 2 position. (*Id.*). According to the plaintiffs, the testing site was "crowded, the test booklets were marked in and people who had not taken the required preparatory courses were allowed to take the test." (Plaintiffs' Memorandum in Opposition to BellSouth's Motion for Summary Judgment ("Pl. Mem. Opp." at ¶

---

[3] Whitman's declaration is located at document 29.

[4] The statements in this paragraph are derived from the "Defendant's Statement of Undisputed Material Facts," which cites references to Linda Lawrence's deposition. Her deposition, however, is not a part of the record. The plaintiff does not dispute the background information in this paragraph.

29)).[5]  Of the 28 individuals tested, 2 were rated as Level 2 qualified, 8 were rated as Level 1 qualified, and 18 were found to be not qualified.  (Pl. Ex. 18 at p. 1).[6]  None of the plaintiffs earned a score qualifying them for a Level 2 job.  (*Id.*).  Only Plaintiffs Jeffreys and Swindell scored well enough to qualify for their present operator positions.  (*Id.*).

The defendant's Force Management Group monitors call volume to make workforce adjustments.  (Jane Parker Declaration ("Parker Dec.") at ¶¶ 3-4).[7]  Jane Parker is the head of the group and is located in Atlanta, Georgia.  She reports to Senior Director Ray Whitman.  (Whitman Dec. at ¶ 1).

The plaintiffs are all over the age of forty and are long term employees of BellSouth.  They worked as toll operators in BellSouth's toll operator service center in Huntsville, Alabama (the "Huntsville office").  They were "non-management, craft employees represented by the Communication Workers of America Union ("Union" or "CWA").  (Def. Statement at p. 1).

The defendant employs toll operators to provide assistance to its customers in making "'traditional' toll calls."  (Whitman Dec. at ¶ 5).  In January 1995, the defendant received about 20.5 million operator-handled toll calls.  (*Id.* at ¶ 6).  It employed approximately 1600 toll operators.  (*Id.* at ¶ 7).  The defendant's western toll complex, which included Alabama, Mississippi, Louisiana, and Tennessee, had eight toll service centers and about 630 operators.  (*Id.* at ¶ 9).  One of those centers was the Huntsville office.  By December 2001, the number of calls had dropped to 2.6 million calls, an 87.3% drop.  (*Id.* at ¶ 6).  The total number of toll operators

---

[5] Plaintiffs' memorandum is located at document 50.

[6] The plaintiffs' exhibits are located at document 51 and are tabbed.

[7] Parker's declaration is located at document 29.

3

was then approximately 223, a reduction of 86.1%.  (*Id.* at ¶ 7).  Only the Huntsville and Jackson, Mississippi, toll centers remained in the western complex at that juncture.  (*Id.* at ¶ 9).  The Huntsville center employed 42 operators and the Jackson center employed 70.  (*Id.*).

In late 2000, Whitman determined that the western complex had about 30 toll operators more than it needed.  (*Id.* at ¶ 10).  He, therefore, decided to declare a "surplus."  (*Id.*).  "Because the number of [t]oll [o]perators in the Huntsville center more closely matched the actual surplus than the number of [t]oll [o]perators in the Jackson toll center, [he] decided to close the former and declare the Huntsville employees to be surplus."  (*Id.*).  Parker, Whitman, George F. Agerton, the defendant's Network President, and C.L. Skaggs, the defendant's Director of Interconnection Operations, all were "involved" in the decision to close the Huntsville office.  (Pl. Ex. 20 at pp. 2-3).

On December 15, 2000, the defendant announced that four offices were to be closed: the Huntsville office and offices in Gainesville, Florida, Columbia, South Carolina, and Anniston, Alabama.  (Pl. Ex. 22).  As a result of the "surplus declaration," approximately 192 individuals were impacted.[8]  The "Questions and Answers – First Quarter 2001 Surplus Declaration" released by the defendant states that the decisions to close these offices were premised on "many factors . . . includ[ing], but not limited to, call volumes, projections for call volumes, and potential to improve operational efficiencies."  (*Id.*).  The announcement further stated, "Based on a complete analysis of all available information, decisions are made to best protect the business in the future."  (*Id.*).  In the defendant's response to the plaintiffs' interrogatories, it stated that the Huntsville office closure was due to "[d]ecreased call volume."  (Pl. Ex. 20 at p. 2).

---

[8] 53 in Anniston, 41 in Huntsville, 63 in Gainesville, and 35 in Columbia.  (Pl. Ex. 22).

The calls traditionally handled in the Huntsville office were routed to the Jackson office. Shortly after the defendant announced the closure of the Huntsville office, the Union asked the defendant to permit the "surplused" operators to transfer to Jackson. (Def. Statement at p. 6 (citing Drummond Dep. at 151-52, 156)).[9]  The defendant agreed to offer the plaintiffs the option of continuing to work as toll operators in Jackson with no loss of seniority, pay, or benefits. (*Id.*).[10]

The plaintiffs did not transfer to Jackson.  None of the plaintiffs applied for jobs as either Customer Assistants or National Directory Assistants. (Drummond Dec. at ¶ 14).

Plaintiffs Coleman, Foster, Hollimon, Jeffreys, Swindell, and Wiggins filed their EEOC charge on or about May 3, 2001.  (Def. Statement at p. 11).  Plaintiff Wells filed her EEOC charge on June 7, 2001.  (*Id.*; Pl. Mem. Opp. at p. 16).  Plaintiffs Acklin and Beckwith filed their charges on or about September 24, 2001.  (*Id.*).[11]  The plaintiffs filed this suit on March 28, 2002.  (Doc. 1).  They allege that the defendant discriminated against them on the basis of age with regard to the September 2000 testing and in implementing the March 2001 "surplus."

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[9] Drummond's deposition is not a part of the record, however, the plaintiffs do not challenge the accuracy of this representation in the defendant's statement.

[10] Temporary workers were hired in Jackson to hold the Jackson positions for any Huntsville operators who chose to relocate. (Whitman Dec. at ¶ 16).

[11] Plaintiff Wells allegedly notified EEOC of her claims in a letter in December 2000. (Pl. Mem. Opp. at p. 16 n.7). However, the letter has not been produced in discovery. (Def. Reply Brief (Doc. 52) at p. 9).

matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant.

6

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v.*

7

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ

on the inferences arising from undisputed facts, then a court should deny summary judgment."

*Allen*, 121 F.3d at 643.

## DISCUSSION

The plaintiffs allege in their amended complaint that, in or around 2000, BellSouth

devised a plan and scheme to discriminate against employees over the age of forty.  (Am. Comp.

at ¶ 23).[12]  BellSouth purportedly did so to save money by replacing senior employees with

younger employees.  (*Id*. at ¶ 24).  The plaintiffs argue that BellSouth closed offices, such as the

Huntsville office, which consisted primarily of older, senior employees such as the plaintiffs, and

then opened new offices in different locations to perform the same functions, but staffed these

offices with young, new employees.  (*Id*. at ¶ 25).  BellSouth purportedly located these offices far

away from the closed offices, knowing that the older, senior employees would not be able to

relocate.  (*Id*.).  They further allege that in or about March 2001, BellSouth terminated the

plaintiffs' positions and offered them positions in the Jackson, Mississippi office knowing it

would be too far away for the plaintiffs to relocate because of family commitments.  (*Id*. at ¶ 26).

The plaintiffs further allege that "[i]n an apparent effort to coverup and disguise its

discrimination against older employees, BellSouth offered a 'test' to determine qualifications for

Level 1 and Level 2 job openings."  (Am. Comp. at ¶ 29).  As part of this scheme, the plaintiffs

state that the test was scheduled for operators who had attended the required preparatory class;

however, new applicants under the age of 40 took the test, passed, and were allowed to receive

BellSouth positions.  (*Id*. at ¶ 29).  The plaintiffs also question the defendant's methods in grading

---

[12] The amended complaint is located at document 13.

8

the tests, the results, and the fact that the tests were shredded. (*Id.* at ¶ 30).

Finally, the plaintiffs allege that the defendant placed them in a "Job Bank" and then announced a hiring freeze. (*Id.* at ¶¶ 27-28). Thereafter, the defendant purportedly filled a "limited number" of new positions with "'new hires' under the age of 40" instead of using the "Job Bank." (*Id.* at ¶ 28).

In their response to the motion for summary judgment, the plaintiffs also allege that "[t]here has been no reduction in force in the [customer assistance] business in the last three years and the defendant is in fact hiring for the customer assistance positions." (Pl. Mem. Opp. at ¶¶ 36-37).

Concerning the customer assistance positions, the defendant asserts that those positions are on the wholesale side of the business and toll operators like the plaintiffs are on the retail side of the business. (Def. Reply at p. 8).[13] The defendant further states that it hires new employees on the wholesale side "when [they] know that [they] have signed a new contract." (Def. Reply at p. 8, quoting Parker Dep. 109-10).[14] According to the defendant, "surplus" considerations for retail (toll operators) are different from those of wholesale (customer assistance). (Def. Reply at p. 8).

Regarding the September 9, 2000, test on which none of the plaintiffs reached Level 2, the defendant asserts that the plaintiffs did not file a timely EEOC charge challenging the same. (Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def. Mem.") at p. 13).[15] According to the defendant, the plaintiffs needed to file their EEOC charge by March 8,

---

[13] Defendant's reply is located at document 52.

[14] Parker's deposition is not included in the record by either party. The plaintiffs, however, do not dispute the accuracy of the statement.

[15] Defendant's memorandum is located at document 28.

9

2001, but did not do so until May 3, 2001.  (*Id.*).

## Procedurally Barred Claims

### Claims of Acklin and Beckwith

The defendant initially maintains that the EEOC charges of plaintiffs Acklin and Beckwith were untimely filed on September 24, 2001, more than 180 days after notice of their termination on December 15, 2000.[16]  (Def. Mem. at p. 3).  According to the defendant, the plaintiffs could file no later than June 8, 2001.  (*Id.* at p. 6).

Acklin and Beckwith counter that their claims are not time barred because (1) the charges of the other plaintiffs put the defendant on notice of such claims and (2) they may "piggyback" on the earlier charges, which are valid claims arising out of "similar discriminatory treatment in the same time frame."  (Pl. Mem. Opp. at p. 16).

The defendant contends that the plaintiffs cannot "piggyback" their claims on the charges of the other plaintiffs because this option is only available for a plaintiff who has not filed an EEOC charge.  (Def. Reply at p. 2).

> The purpose of the requirement that a plaintiff file an EEOC charge within 180 days (or 300 days in a deferral state) of the allegedly illegal act or practice is (1) to give the employer prompt notice of the complaint against it, and (2) to give the EEOC sufficient time to attempt the conciliation process before a civil action is filed.  *Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1562-65 (11th Cir. 1988), *vacated on other grounds sub nom., Swint v. Pullman-Standard*, 493 U.S. 929, 110 S. Ct. 316, 107 L. Ed. 2d 307 (1989).  The principle behind the piggybacking rule is to give effect to the remedial purposes of the ADEA and to not exclude otherwise suitable plaintiffs from an ADEA class action simply because they have not performed the "useless act of filing a charge."  *See Larson,*

---

[16] "The proper focus for when a statute of limitations begins to run is the time of the discriminatory act." *Jones v. Dillard's, Inc.,* 331 F.3d 1259, 1263 (11th Cir. 2003).  In this case that date could be the date of the September 2000 testing, the December 2000 notice of closing, or March 31, 2001, when the Huntsville office closed.  The plaintiffs offer nothing to indicate that any date other than the December 2000 notice date should be used.  Even if the March 2001 date is used, the motion is still due to be granted for the other reasons stated in this Report and Recommendation.

> *Employment Discrimination* § 102.35(b) at 21-276.29--21-276.30. *See Mooney v.*
> *Aramco Serv. Co.*, 54 F.3d 1207, 1223 (5th Cir. 1995) ("'It would be wasteful, if
> not vain for numerous employees, all with the same grievance, to have to process
> many identical complaints with the EEOC.'") (quoting *Oatis v. Crown Zellerbach*
> *Corp.*, 398 F.2d 496, 499 (5th Cir. 1968)).

*Grayson v. K Mart Corp.*, 79 F.3d 1086, 1102-03 (11th Cir. 1996). The Eleventh Circuit Court of

Appeals in *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997), stated

that "where a plaintiff has filed an individual EEOC charge, such a plaintiff should be required to

rely upon his or her own EEOC charge, and cannot reasonably rely upon the other claimant's

charge. Thus, we conclude that [that plaintiff] may not 'piggyback' onto [another claimant's]

ADEA claim." *See also Butler v. Matsushita Communication Industrial Corp. of U.S.*, 203

F.R.D. 575, 584 (N.D. Ga. 2001) ("The rule in the Eleventh Circuit is that 'where a plaintiff has

filed an individual EEOC charge, such a plaintiff should be required to rely upon his or her own

EEOC charge, and cannot reasonably rely upon the other claimant's charge.' . . . '[W]here the

party wishing to piggyback has filed his own charge' that party is 'bound by the parameters of his

own EEOC charge and cannot subsequently utilize the single filing rule to avoid the statute of

limitations.' *Mooney v. Aramco Services*, 54 F.3d 1207, 1223-24 (5th Cir. 1995)").

Premised on the foregoing, the court finds that the claims of plaintiffs Acklin and

Beckwith are time-barred. They cannot rely on the filing of the other plaintiffs to excuse their

untimely filing.[17] Summary judgment is due to be granted on their claims for this reason.

### Claims Regarding the September 2000 Test

To the extent that the plaintiffs assert that they were discriminated against with regard to

---

[17] The plaintiffs do not offer, and the record fails to demonstrate, any justification for equitable tolling of the statute of limitations in this case. *Jones*, 331 F.3d at 1263-66.

the testing that took place on September 9, 2000, the defendant asserts that any claim by the plaintiffs regarding that testing and the scoring of those tests are also time barred. According to the defendant, any claim was due to be filed with the EEOC by March 8, 2001. The plaintiffs retort that their claim regarding the September testing is timely because they each filed a grievance with their Union regarding the testing conditions. (Pl. Mem. Opp. at p. 17). They also assert that Plaintiff Wells wrote a letter to the EEOC in December 2000, regarding her claims against BellSouth.[18] (*Id.*).

The court must begin with the well-settled premise that the filing of a grievance with the union does not toll the 180-day charge filing period. *International Union of Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 91 S. Ct. 441, 50 L. Ed. 2d 427 (1979) (the existence and utilization of collective-bargaining grievance procedures does not toll the running of the statute of limitations period for filing a claim with the EEOC). The plaintiffs filed their EEOC charge on May 3, 2001. It was therefore almost two months late. Accordingly, this claim is barred from review.

To the extent that Plaintiff Wells asserts that she wrote a letter to the EEOC sometime in December 2000, the court finds this inadequate under the circumstances for a number of reasons. First, counsel has never produced the purported letter submitted to the EEOC.[19] Second, the specific content of the letter has not been articulated sufficiently. Third, there is no evidence before the court demonstrating that the defendant was notified by the EEOC of the filing of any

---

[18] The plaintiffs' counsel informed the court that the letter has not been located. (*Id.*).

[19] The court does not find this fact alone dispositive.

12

such letter.[20] *See Turner v. Springhill Memorial Hospital*, No. 98-0334-P-M, 1999 U.S. Dist. LEXIS 6545 (S.D. Ala. April 12, 1999).

Even were the court to find that Plaintiff Wells' letter was sufficient to meet the statutory requirement, the remaining plaintiffs cannot rely upon that letter for the reasons stated above. They filed separate EEOC charges and are bound by those allegations.

### Service Representative and Collections Representative Positions

The defendant states in its "Statement of Undisputed Material Facts" that the plaintiffs' suit contains an allegation that they (the plaintiffs) should have been promoted to either collections representative or service representative positions. (Def. Statement at p. 11). The defendant further states therein that "none of the Plaintiffs were qualified for promotion to these jobs, which required a Level 2 GQT rating." (*Id.*). The plaintiffs did not respond to this statement in their brief. The defendant notes in its reply that the plaintiffs did not offer anything in support of this claim. BellSouth also notes that the plaintiffs failed to respond to this matter. (Def. Reply at p. 8).

As noted above, when a motion for summary judgment is made and supported as required by Rule 56, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56. The Rule further provides that "[i]f the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id. See also Hernandez v. Wilsonart Intern., Inc.*, No. 99-1882CIVLENARD, 2000 WL 33146761, *1 (S.D.

---

[20] The defendant simply was aware of the plaintiffs' dissatisfaction with the testing because of the grievance with the union concerning the testing. However, that matter was resolved when the defendant and the Union agreed to permit the employees to retake the test. (*See* Def. Reply at 11).

Fla. Nov. 22, 2000).

Due to the fact that the plaintiffs have not responded and there is nothing in the record

demonstrating that the plaintiffs possessed the necessary Level 2 GQT rating to qualify them for

such positions, the court finds that summary judgment is due to be granted on these claims.

### Discriminatory Discharge Claim

The remaining claim in this matter concerns the defendant's decision to close the

Huntsville office, resulting in the termination of the plaintiffs.  Where a position or positions are

eliminated or there is a reduction in force, in order to demonstrate a *prima facie* case of

discrimination, a plaintiff must show the following:

> (1) that he was in a protected age group and was adversely affected by an
> employment decision [ ], (2) that he was qualified for his current position or to
> assume another position at the time of discharge, and (3) evidence by which a fact
> finder reasonably could conclude that the employer intended to discriminate on the
> basis of age in reaching that decision.

*Benson v. Tocca, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997) (footnote omitted) (citing *Mitchell v.*

*Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 567-68; *Earley*, 907 F.2d at 1082; *Verbraeken v.*

*Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045-45 (11th Cir. 1989).

Under the familiar *McDonnell-Douglas* framework,[21] if the plaintiffs establish a *prima*

*facie* case, they create a presumption that the defendant discriminated against them, and the

burden then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its

actions.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied*, 522

U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998) (citing *McDonnell Douglas Corp. v. Green*,

---

[21] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105 (2000)
(noting the widespread use of the *McDonnell Douglas* framework in ADEA cases and assuming its applicability).

14

411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)).  Once the defendant meets its

burden of production, the plaintiffs are afforded an opportunity to demonstrate that the

defendant's proffered reason was not the true reason for the employment decision.  *Combs*, 106

F.3d at 1528.

In the instant case, the defendant asserts that the plaintiffs cannot meet the first and third

elements of a *prima facie* case in that they did not suffer an adverse employment action (Def.

Mem. at p. 7) and there is no evidence from which a reasonable fact-finder could infer

discrimination (*id.* at 9).  Additionally, the defendant asserts that the decision-maker in this case

(Whitman) did not know the plaintiffs' ages (*id.*).  The defendant further asserts that the plaintiffs

have offered no evidence of pretext to rebut its reason for the closing of the Huntsville office.  (*Id.*

at 12).  The plaintiffs dispute each of the defendant's contentions.  (Pl. Mem. Opp. at pp. 9-15).

The plaintiffs must prove all elements of their *prima facie* case because there is no direct

evidence of discrimination in this case.  The defendant initially contends that the plaintiffs cannot

prove that they suffered an adverse employment action.  The plaintiffs maintain that they meet all

of the *prima facie* elements of age discrimination.  First, they assert that they are all members of a

protected age group and they were adversely affected by BellSouth's decision to close the

Huntsville office.  (Pl. Res. at p. 9).  The defendant disputes that the closing of the Huntsville

office and the offer of reassignment to the Jackson, Mississippi office constitutes an adverse

employment decision under the present circumstances.  (Def. Mem. at p. 7).  The plaintiffs label

the closure of the Huntsville office as a distinct adverse employment decision (Pl. Mem. Opp. at

p. 10) and further assert that the offer of relocation to Jackson constitutes a separate adverse

employment decision as well.  (*Id.*).

15

The parties direct the court's attention to *Shannon v. BellSouth*, 292 F.3d 712, 716 (11th Cir. 2002), in determining whether reassignment does or does not constitute adverse employment action. (Def. Mem. at p. 7; Pl. Mem. Opp. at pp. 10-11). The defendant quotes the following language in *Shannon*, "[plaintiff's] reassignment does not constitute [an] adverse employment action." (*Id.*). The plaintiffs quote the following from the same case, "conduct that alters an employee's compensation, terms conditions, or privileges of employment does constitute adverse action under Title VII." (Pl. Mem. Opp. at pp. 10-11 (citing *Shannon*, 292 F.3d at 716)). The plaintiffs further maintain that the defendant misconstrues *Shannon* in that it only holds that reassignment under the facts in that case is not adverse employment action. (Pl. Mem. Opp. at p. 10 n.5).

The defendant also cites the holding in *Maddow v. Proctor & Gamble*, 107 F.3d 846, 849 (11th Cir. 1997), that reassignment was an adverse employment action because the employee had specifically stated that she would not accept a relocation from Atlanta to Huntsville and was shortly thereafter reassigned. (Def. Mem. at p. 8 n.2). The plaintiffs similarly cite *Maddow* in support of their argument. (Pl. Mem. Opp. at p. 10). The defendant further points out that the Eleventh Circuit has made it clear that the federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." (Def. Reply at pp. 3-4 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

In the usual circumstance, the closing of the Huntsville office would be an adverse employment action. However, under the present circumstances, the court must find otherwise. After the "surplus" announcement was made, as a result of the union's action, the defendant agreed to allow the plaintiffs a "follow-your-work" option approximately one month later.

16

Accordingly, the plaintiffs could have transferred to the Jackson office to continue in the same positions. There is no evidence that they would have suffered any diminution in title, salary, or benefits had they transferred. To the contrary, it appears that they would have been in the same job position.[22] Simply stated, there was no adverse employment action under the circumstances.

The citations provided by the plaintiffs do not preclude this result. In *Maddow*, the court held that the plaintiff had demonstrated a *prima facie* case of discrimination when she presented evidence that after she was interviewed by the defendant, which had acquired the company she worked for, and subsequently was asked about her age (over forty), she was offered a job outside the only area she said she would accept. *Maddow*, 107 F.3d at 853. The court found that the plaintiff had created a reasonable inference that the terms and conditions of her employment were affected because of her age. *Id*.

*Stamey v. Southern Bell Telephone & Telegraph Co.*, 859 F.2d 855 (11th Cir. 1997), which is also cited by the plaintiffs, is factually distinguishable because it is a constructive discharge case involving a retirement. It adds nothing to the present discussion.

In *Shannon*, the plaintiff brought a claim against the defendant alleging religious discrimination and retaliation. The defendant asserted that the plaintiff failed "to prove the tangible harm necessary to constitute an adverse action because, as of trial, he still was employed by BellSouth with the same job title even though he had been reassigned to a different geographical area." *Shannon*, 292 F.3d at 716. The Eleventh Circuit agreed finding that the plaintiff's reassignment in that instance did not constitute an adverse employment action. *Id*. In part, it stated:

---

[22] The record further demonstrates that the defendant would have paid the plaintiff's relocation expenses.

17

> . . . . Adverse employment action does not refer only to ultimate
> employment decisions, such as the decision to discharge an employee.  *Wideman v.*
> *Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).  Employer conduct
> falling short of an ultimate employment decision may still be cognizable under
> Title VII if it reaches "some threshold level of substantiality."  *Id.*  "While not
> everything that makes an employee unhappy is an actionable adverse action,
> conduct that alters an employee's compensation, terms, conditions, or privileges of
> employment does constitute adverse action under Title VII."  *Bass v. Bd. of County*
> *Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001) (citation omitted) (internal
> quotation marks omitted).

*Shannon*, 292 F.3d at 716.

Applying the foregoing authorities, the court once again concludes that under the

particular circumstances in this matter, the plaintiffs have failed to set forth a *prima facie* case of

discrimination concerning the closing of the Huntsville office and the relocation offer.  Summary

judgment is due to be granted the defendant on the plaintiffs' discrimination claims concerning

the closing and the relocation offer.

Next, the defendant asserts that the plaintiffs have failed to present enough evidence to

establish the third element that the defendant acted with discriminatory intent.  The defendant

argues that it "surplused" all of the toll operators in Huntsville, offering all the same employment

and contract options.  (Def. Mem. at p. 9).

The plaintiffs argue that the defendant's discriminatory intent is evident in the fact that in

the "surplused" offices, the overall population was over 40.  In support of this position, they state

as follows:

> Specifically, of the 42 employees of the Huntsville toll office in December 2000,
> only <u>one</u> was <u>below</u> the age of 40. . . .  In the Gainesville, Florida toll office, which
> was also declared surplus in December 2000 and marked for closure, 81 of the 93
> employees from January 1, 1998, to December 31, 2001 were <u>over</u> the age of 40.
> In the Knoxville, Tennessee toll office, another toll office closed by BellSouth, <u>all</u>
> of the 66 employees were over the age of 40.  Likewise, in the Owensboro toll

18

> office, 107 of the 115 toll operators were over the age of 40.  These statistics are
> evidence that BellSouth had a pattern and practice of systematically discriminating
> against its older, more senior employees. . . .

(Pl. Mem. Opp. at p. 12) (citations omitted).

The fact that the operators in most of the "surplused" offices were over the age of forty

does not demonstrate the requisite discriminatory intent.  The plaintiffs cite *Stamey*, 859 F.2d at

862, in support of their argument that this statistical evidence is sufficient to meet the third

element of a *prima facie* case.  In *Stamey*, the court stated that an "employer may not organize its

workforce to expose older employees to reductions while insulating younger employees."  (Pl.

Mem. Opp. at  p. 12).  The defendant contends that the plaintiffs' disparate impact argument is not

permitted as a matter of law.[23]  (Def. Reply at p. 6).  The defendant relies on *Adams v. Florida*

*Power Corp.*, 255 F.3d 1322, 1324 n.4 (11th Cir. 2001), *cert. denied as improvidently granted*,

535 U. S. 228, 122 S. Ct. 643, 151 L. Ed. 2d 345 (2002), where the court stated that disparate

impact claims may not be brought under the ADEA.  The court reasoned that disparate impact

requires no proof of intent to prove liability while the ADEA does.

The court agrees with the defendant.  Premised on the holding in *Adams* that disparate

impact claims may not be brought under the ADEA, this court finds that the plaintiffs' evidence

of a disparate impact is insufficient to demonstrate discriminatory intent to satisfy the third

element of a *prima facie* case.  *Adams*, 255 F.3d at 1326.

The defendant next maintains that because the decision-makers did not know the ages of

---

[23] For purposes of this discussion, the court uses the definition of "disparate impact" as defined by the United States Supreme Court, which provides that a "disparate impact claim is one that 'involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S. Ct. 1701, 1705, 123 L. Ed. 2d 338 (1993) (quoting *Teamsters v. United States*, 431 U.S. 324, 335-36 n.15, 97 S. Ct. 1843, 1855 n.15, 52 L. Ed. 2d 396 (1977))."  *Adams*, 255 F.3d at 1324 n.4.

the plaintiffs, they cannot demonstrate a *prima facie* case.  Specifically, the defendant asserts that if the decision-makers did not know that the plaintiffs belonged to a protected class, then no inference of discrimination could arise.  (Def. Mem. at p. 9).  BellSouth relies on the holding in *Lubetsky v. Applied Card Systems*, 296 F.3d 1301 (11th Cir. 2002), *cert. denied*, 537 U.S. 1106, 123 S. Ct. 872, 154 L. Ed. 2d 776 (2003), where the court stated that "[i]t is necessary for a plaintiff attempting to establish a *prima facie* case of intentional religious discrimination under Title VII to demonstrate the challenged employment decision was made by someone who had knowledge of the plaintiff's religion." *Lubetsky*, 296 F.3d at 1307.  The plaintiffs first assert that this is not an element of a *prima facie* case and secondly assert that the evidence shows that certain of the decision-makers "knew or had access" to the seniority dates of the plaintiffs.  (Pl. Mem. Opp. at p. 14).

At the outset, the court agrees with the defendant that the holding in *Lubetsky*, although factually distinguishable, provides this court with direction in this matter.  *Lubetsky* makes it clear that a decision-maker must have sufficient knowledge of a plaintiff's age when making the challenged decision.  Having so determined, the next matter for this court to consider is whether the plaintiffs have demonstrated the requisite knowledge to overcome the motion for summary judgment.

The plaintiffs assert that Trip Agerton, Ray Whitman, Cessna Skaggs, and Jane Parker are the relevant decision-makers.  They further assert that Agerton and Skaggs visited the Huntsville office and met with some of the plaintiffs.  (Agerton Dep. at 27, 34, 181; Skaggs Dep. at 88-89).[24]

---

[24] Agerton's deposition is located at document 51, Exhibit 3, and Skaggs' deposition is located at document 51, Exhibit 4.

Additionally, they assert that Parker's office has and utilizes the employees seniority dates for scheduling purposes.[25] (Parker Dep. at 89-90).

With regard to Agerton, who was Whitman's boss, the evidence is that he visited the Huntsville office once, within about 18 months of his promotion to the position of president of operation services in December 1997. (Agerton Dep. at 18, 27-28). He further stated in his deposition that he did not know the ages of the operators in the various offices, much less the ages of the plaintiffs in this case. (Agerton Dep. at 185). The court does not find this evidence sufficient to support a conclusion that Agerton knew the ages of the plaintiffs. To the contrary, his specific testimony was otherwise. The plaintiffs' reliance on the one office visit, well before the office was closed, is insufficient.[26]

With regard to Skaggs, who was consulted after the decision was made, the court finds that she was not a decision maker for purposes of the ADEA in this instance. Skaggs testified as follows regarding this matter:

> My involvement in closing or opening offices is somewhat after the fact. The process is done by the force group and our facility people. And then other directors are brought in and discuss the reasons of why they are doing that and see if we have any major concerns or what we need to do about our part of the job of taking care of dealing with closing of the office.
>
> But the decisions themselves are made by the force and facility people along with the president of the department.

(Skaggs Dep. at 28-29).

With regard to Parker, the evidence is clear that she did not know the ages of the plaintiffs.

---

[25] Parker in fact testified that although her office had the seniority dates of the employees, the scheduling was done automatically by the computer system. (Parker Dep. at 89-90).

[26] To the extent that the defendant argues that Agerton was not a decisionmaker because he "approved without review Whitman's decision to close the Huntsville office," the court is not impressed. (Def. Reply at p. 5).

(Parker Dep. at 17-18). She also did not have access to the records of such. (*Id.*).

The court does not find the foregoing sufficient as a matter of law to overcome the motion for summary judgment. Even were the court satisfied that the plaintiffs have established a *prima facie* case of discrimination concerning the closing of the Huntsville office, the defendant has offered a legitimate business reason for its action. Accordingly, the next issue is whether the plaintiffs have offered sufficient evidence of pretext. The court finds that they have not.

The plaintiffs do not offer evidence demonstrating pretext except for their arguments of disparate impact resulting from the decision by management to "surplus" the traditional toll office employees. The often-repeated statement that "Federal Courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior" is appropriate in this instance. *Elrod*, 939 F.2d at 1470.

BellSouth closed the entire Huntsville office, along with other offices, and it offered the plaintiffs the opportunity to transfer to the Jackson office. There is insufficient evidence of pretext to permit this court to deny the motion for summary judgment. To the extent that the plaintiffs assert that the defendant "performed no written analysis or evaluation of its decision to close the Huntsville toll office," the court cannot find that this is adequate to demonstrate pretext. (Pl. Mem. Opp. at 12). Similarly, the absence of any written policy manual or guidelines for office closing decisions and the absence of any training on that decision making process is not sufficient to show pretext.

To the extent that the plaintiffs assert that the decision to close the Huntsville office "is based on some ball park figures (Parker Dep. 107-08), and a not-so-precise call volume chart

which its provider, Jane Parker, cannot even adequately explain (Parker Dep. at 65-68)," the court also finds this insufficient.  (Pl. Mem. Opp. at 12).  Parker did use the words "ball park of the surplus" during her deposition testimony when she was discussing the "surplus" of operators. (Parker Dep. at 106).  The court is not impressed by the parsing of her words when they are placed in the context of her overall testimony and the facts before the court.  Additionally, the plaintiffs' criticism of the call volume chart is not sufficient to demonstrate pretext.

The plaintiffs also assert that the fact that the defendant "does not apply its decision making process equally to the C[ustomer] A[ssistance] offices, which also show surplus numbers but employ younger, less senior persons[.]  (Parker Dep. at 109-10)" demonstrates pretext.  (Pl. Mem. Opp. at 13).  The court does not find this sufficient to demonstrate pretext.  Parker testified that "Customer Assistance" is different for two reasons.  First, BellSouth oftentimes has to "bring employees on when we know that we have signed a new contract for a customer where they will be coming on line at a certain time.  We have to bring the people in and get them trained and up to speed in order to be able to handle those additional calls." (Parker Dep. at 109).  Second, the surplus declarations under the applicable contracts for the two positions are different.  (*Id*. at 109-10).

Finally, the court does not find the plaintiffs' complaints about the testing conditions and circumstances adequate either.

## CONCLUSION

For the above reasons, the court finds that the defendant's motion for summary judgment (doc. 27) is due to be granted.

The Clerk is **DIRECTED** to serve a copy of this report and recommendation upon counsel

of record.

        **DONE**, this the _21ST_ day of May, 2004.

                                 **JOHN E. OTT**
                                 United States Magistrate Judge